### ANDERSON et al. v. FEDERAL CARTRIDGE CORPORATION.

Civil Action No. 1109.

District Court, D. Minnesota, Fourth Division.

June 11, 1945.

Harrison E. Fryberger, of Minneapolis, Minn., for plaintiffs.

Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., and Bert E. Church, of Kansas City, Mo., for defendant.

JOYCE, District Judge.

This is an action by Frode Anderson and eleven other plaintiffs for recovery of varying amounts of overtime compensation, liquidated damages, attorney's fees and costs, under the Fair Labor Standards Act of 1938, 52 Stat. 1060, 1063, 29 U.S. C.A. §§ 201–219. The action is in the nature of a class suit in which there are some 164 individual plaintiffs, employees and former employees of defendant, but pursuant to an order of the court plaintiffs' counsel has selected these twelve individual plaintiffs for trial. The remainder will be held until the determination here.

Defendant is a cost-plus-a-fixed-fee contractor with the United States Government for the manufacture of small arms ammunition. These operations are carried on at the Twin Cities Ordnance Plant near New Brighton, Minnesota. Construction of the plant was commenced in August, 1941, but production did not get under way until March 9, 1942. Defendant selected certain of its employees for special training at the Frankford Arsenal at Philadelphia, Pa. It also conducted a training school of its own at Minneapolis. Several of these plaintiffs spent some time at either or both of these places where they were trained or assisted in the training of others prior to commencement of production at the plant.

The ordnance plant is divided into two main branches,—production and inspection. As the names imply, the first is concerned with the production of ammunition and the second is concerned with the inspection of the component parts and the finished product, a sort of check on production to make certain the product is according to Government specifications. Final acceptance rests with the ordnance department representatives at the plant site. There are ancillary general branches or departments such as maintenance, plant protection, and personnel. There are a number of main production buildings on the plant site, each

778

a separate manufacturing unit. Each of these buildings has certain well defined production departments such as loading, guage and weigh, wash and dry, bullet, charging, and packing. Each production building also has its own personnel office. The plaintiffs here held various titles, such as Building Superintendent, Assistant Building Superintendent, Fire Department Chief, Inspector I, II, and III, Personnel Technician II, and General Foreman and Shift Foreman of the various departments above named. They were all paid straight weekly salaries regardless of the number of hours worked in a work week. Their salaries ranged from $58.40 to $104 per week.

■■■ The first point in issue is whether those plaintiffs who were employed before production of ammunition commenced on March 9, 1942, are entitled to the benefits of the Act. Some of plaintiffs were so-called "key men" and were sent to the Frankford Arsenal for training. There they learned the technique of small arms ammunition manufacture, and the plaintiff Klug spent some time in the East purchasing machinery for use at the Twin Cities Ordnance Plant. Before production actually commenced machinery had to be installed and assembled as the plant prepared for production activities. The question is whether plaintiffs engaged in these preliminary activities were "engaged in commerce or in the production of goods for commerce" within the meaning of the Wage and Hours provision of the Fair Labor Standards Act, 29 U.S.C.A. §§ 206, 207. Section 3 of the Act, 29 U.S.C.A. § 203, contains these definitions:

"(i) 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof.

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this. chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

So if an employee were engaged in an occupation necessary to the production of goods for commerce, he is entitled to the benefits of the Act. This burden of proof is on the employee, Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83, and whether the Act applies depends on the nature of his activities, Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

■ It is my opinion that plaintiffs have not met that burden of proof. The plant was not in production during this period although it was preparing to go into production of small arms ammunition. It had "produced" no "goods" for commerce. No case has been called to my attention where an employee has been held engaged in an occupation necessary for the production of goods for commerce when the employer is not engaged in commerce or in the production of any goods at all. In Warren-Bradshaw Drilling Co. v. Hall, supra, employees of an independent contractor engaged in drilling oil wells to a depth short of striking oil were held to be covered by the Act as being in a "process or occupation necessary to the production" of oil for interstate commerce. The court pointed out that "oil is obtained only by piercing the earth's surface; drilling a well is a *necessary part of the productive process* to which it is intimately related." 317 U.S. 91, 63 S.Ct. 126, 87 L.Ed. 83. (Italics supplied). In other words, the drilling was considered as a part of the productive process and the Supreme Court considered employees so engaged as covered by the Act. The distinguishing fact here is that plaintiffs' activities in receiving training and assembling machines were before there was any "productive process" at all. They were preparatory to but not a necessary part of such process. Suppose such plaintiffs had resigned or were found not to meet the standards required in their training and were terminated before any productive process was commenced. Or suppose that defendant's contract was suspended or for some other reason the plant never commenced manufacture; should it then be said that such employees were engaged in the production of goods for commerce?

In Belzano v. Williams,[1] D.C.Cal. plaintiffs, who were the maintenance men en-

---

[1] No opinion for publication.

gaged in the care and cleaning of equipment, and machinists who were working on machines being built in a film laboratory which was under construction but not yet in production, were held not to be in commerce or in the production of goods for commerce.

In Wells v. Ford, Bacon & Davis,[1] D.C. W.D.Ky., inspectors of materials going into buildings being constructed for manufacture of synthetic rubber intended for interstate commerce and where the defendant specialized in the construction of such buildings, were held not to be within the coverage of the Fair Labor Standards Act. This case was affirmed without opinion, 6 Cir., 145 F.2d 240.

The same question arose in Lyons v. H. K. Ferguson Co., La.App., First Circuit, 16 So.2d 587, 593. Plaintiff was employed as a guard of the building construction activities of defendant, which was an agent of the defendant's plant corporation. It was intended that the buildings would be used to process raw materials for the manufacture of synthetic rubber which was expected to be shipped in interstate commerce. The court analyzed the problem carefully, distinguishes the Warren-Bradshaw case, and concludes:

"Therefore the Act does not apply to employees engaged in the original construction of buildings, even though the buildings, when completed, will be used to produce goods for interstate commerce."

The same conclusion was reached by our Circuit Court of Appeals in Noonan v. Fruco Construction Co., 8 Cir., 140 F.2d 633. The very question before me was before Judge Dewey in Timberlake v. Day & Zimmerman, D.C., 49 F.Supp. 28. Defendant was the contract operator of the Iowa Ordnance Plant engaged in the manufacture of ammunition. Plaintiffs were members of the guard force during the plant's construction and became employees of the defendant contractor on July 3, 1941. However, defendant did not commence the processing and manufacturing of materials intended for interstate commerce until August 21, 1941. It was held that after the latter date plaintiffs were engaged in work necessary to the production of goods for commerce but not before then. I come to the same conclusion here. The evidence does not support a finding that any plaintiffs are entitled to the benefits of the Act

before production commenced at the Twin Cities Ordnance Plant on March 9, 1942. It has been stipulated that after that date they were engaged in commerce within the meaning of the Act.

■ The defenses are that plaintiffs were all employed in bona fide executive, administrative or professional capacities and were exempt under 29 U.S.C.A. § 213 (a) from the hours and wages provisions. This section of the Act must be construed strictly and the Administrator's definitions of terms must be followed. Smith v. Porter, 8 Cir., 143 F.2d 292; Helliwell v. Haberman, 2 Cir., 140 F.2d 833. The Administrator's definitions are set out in many of the cases and in 29 C.F.R. Sec. 541 and need not be repeated here. We are primarily concerned with the executive exemption.

Certain questions are common to all plaintiffs and will not need individual comment. All received well over $30 a week for the periods in question. The evidence as to whether they had authority to hire or fire, or whether their recommendations as to advancement and promotion or any other change of status of other employees was given particular weight, is also common to all plaintiffs, as is the question of whether each was hired for a forty hour workweek.

*Were Plaintiffs Employed on the Basis of a Forty-Hour Workweek?*

To support their contention each plaintiff was shown a small booklet called "A Manual for Employees" which was published by defendant and given to each plaintiff as well as all other employees at some time during his employment. Each plaintiff's attention was then called to certain excerpts from the booklet, of which the following is a sample:

"D. Hours of Work

"1. Hours of work are at the regular schedule of forty hours per payroll week. For authorized and required hours in excess of forty in any payroll week, or in excess of eight in any day, payroll will be made pursuant to the provisions of the Wage-Hour and the Walsh-Healey Acts, on the basis of one and one-half times the regular per hour rate, or such other rate as may be established by law or by the President's directive, *provided the position is not exempt under the Wage-Hour Act*

---

[1] No opinion for publication.

or the Walsh-Healey Act," [41 U.S.C.A. § 35 et seq.] (Italics supplied).

■ Plaintiffs' attention was also called to the section in the manual which stated that for vacation purposes "one week" meant forty hours. Each plaintiff testified that he "relied" upon this language. There was no testimony as to what plaintiffs meant by this "reliance" but their counsel states in his brief that if plaintiffs had not thought they would recover the amounts asked for in this suit (which range from $2,713.54 to $15,820.90 in addition to their rather substantial salaries), "they would have quit the plant instanter." There is no support in the evidence for such conclusion and the contention that these booklets, which cover a wide variety of informative material, constituted a contract of employment between defendant and these plaintiffs, in my opinion is unsound. It is specifically stated in the booklet that the forty hour week and overtime provisions do not apply to exempt employees. There is no serious question but that all of these plaintiffs were considered to be exempt by the defendant. Plaintiffs' own actions during their term of employment disclose clearly what the contract was. When each was promoted to the straight salary classification he was given a definite job to do with supervisory duties and without particular reference to hours. All plaintiffs worked varying times from less than forty to more than sixty hours in a workweek, although the standard for non-exempt employees was usually forty-eight hours. Each week they received the same salary without complaint or any indication that such was not their agreement with the company. That they later became dissatisfied with the arrangement, in no way changes its nature.

■ This same contention was urged in Landreth v. Ford, Bacon & Davis, 8 Cir., 147 F.2d 446, 448. The facts are strikingly similar. Defendant was a contract operator of a munitions plant. Plaintiff was first employed at an hourly rate with overtime and then promoted to a supervisory classification and paid a weekly salary on the theory that he was an exempt employee under the Fair Labor Standards Act. On the trial it was conceded this classification was erroneous and the only question was whether he was employed for a forty hour week or a variable workweek. In sustaining a finding that there was no contract for a forty hour week, our Circuit Court said:

"In this argument we think the appellant overlooks the fact that, although appellee erred in its interpretation of the Fair Labor Standards Act, it, nevertheless, classified the appellant and others like him as supervisory employees under a wage policy which definitely provided for the employment of employees in this classification for a workweek of unlimited hours. * * *

"But a policy of compliance with the Fair Labor Standards Act does not necessarily include the adoption of a forty hour workweek. The Fair Labor Standards Act does not limit an employee's workweek to forty hours. On the contrary, it expressly permits employment for a workweek in excess of forty hours on condition that the employee receive compensation for time over forty hours at one and one-half times the regular rate at which he is employed. * * *

"It must be borne in mind that there is nothing in the Fair Labor Standards Act which denies to appellee the right to classify the jobs for which it hires its employees, and to classify the employees hired in accordance with the jobs assigned to them. The error of the appellee was not in the classification of employees but in its interpretation of the Fair Labor Standards Act as applied to those employees, an error which requires for its correction only the proper computation and payment of the overtime compensation to which a given employee is entitled."

This language is equally applicable here and I reach the same conclusion.

The recovery of any of these plaintiffs will be determined by the variable workweek formula as explained in Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, and as applied in Snyder v. Wessner, D.C., 55 F.Supp. 971.

### Did Plaintiffs Have Authority to Hire or Fire Within the Meaning of the Regulations (29 C.F.R. Sec. 541.1(c)?

■ As might be expected of a plant with over 15,000 employees personnel procedures were standardized. Consequently the evidence applicable to each plaintiff was similar to others. All plaintiffs had supervisory duties. As part of those duties each was required to and regularly did rate and appraise his subordinates on forms furnished by the company. These records became part of the personnel files. The documentary evidence on this point is volumin-

ous and a perusal of it convinces me that these plaintiffs conscientiously endeavored to follow the company's policy in this regard. There is also evidence that in some departments, such as the Fire Department and Machine Shop, no hiring was done without approval of the supervisory head. Plaintiffs admit that one of their supervisory duties was to enforce company rules, particularly safety rules as some of the work was extremely hazardous. For infractions of these rules the supervisor could remove the offender from the premises in a serious case or suspend him to the grievance committee. That such instances may have been of infrequent occurrence does not alter the fact that the authority existed and that supervisors' recommendations were given particular weight. Smith v. Porter, 8 Cir., 143 F.2d 292; Marshall-Wells Co. v. Hawley, D.C., 53 F.Supp. 295. No other conclusion is consistent with the circumstances. The supervisor was in a better position to inform his employer about the subordinates than anyone else, and, subject to seniority rules, the supervisor's opinions and recommendations as expressed in his ratings and appraisals were given particular weight in cases of promotions or changes of status. In fact, the evidence disclosed the promotion of one of these plaintiffs shortly after favorable recommendation by his superior who is another plaintiff here. I conclude the defendant has sustained its burden of proof on this issue for all plaintiffs.

*Joseph Klug.*

This plaintiff held the titles of Assistant Superintendent and Superintendent of one of the large production buildings during the period for which overtime was claimed. His salary ranged from $300 per month to $104 per week. Immediately before working for defendant he earned $180 a month. As superintendent this plaintiff was the head supervisory officer over production in the building. He was furnished with a private office. At one time there were over 1600 production employees under his supervision including three assistant superintendents, seven general foremen and twenty-one shift foremen, all of whom were classified as supervisory personnel and some of whom are plaintiffs here.

There is considerable testimony as to the activities of this plaintiff, much of it documentary in the form of correspond-

ence. His duties were many and varied and were apparently ably performed. His responsibility was heavy as he was directly responsible for the production of ammunition in that building. There is no doubt but that his primary duty consisted of the management of the productive processes in the building and that he regularly and customarily directed the work of his subordinates and exercised discretionary powers. His testimony to the contrary and that he was merely a messenger boy verges on the ridiculous. As said of a similar plaintiff in Stanger v. Glenn L. Martin Co., D.C., 56 F.Supp. 163, 168, speaking of a change in viewpoint induced by this kind of litigation: "Had he then been treated as a mere clerk, he would have strongly repudiated any such disparaging designation of his status." All of these plaintiffs apparently took the position that because there were certain well defined policies to be followed there was no opportunity for them to exercise discretion. If that were true, the statutory exemptions would be meaningless as no business could operate without well defined policies. This is especially true of the manufacture of ammunition where precision and accuracy of the manufactured product is literally a matter of life and death. To hold that in order to qualify as exempt a supervisor would have to have unbridled discretion to initiate and change contrary to common sense. The fact is that the supervisors are bound by the company's procedures and in addition have the responsibility of seeing that they are carried out and are obeyed by other employees. This involves the exercise of discretion in a high degree and is of the very essence of supervisory work.

There is some conflict in the evidence as to whether the plaintiff Klug spent more than 20% of his time doing work of the same nature as non-exempt employees. It appears that whenever there was trouble on the production floor Klug was present to help alleviate it. It seems obvious that this was part of his supervisory duties. That he worked hard and for long hours is in no way inconsistent with his supervisory responsibilities. The weight of the credible evidence is that Klug spent considerably less time than the 20% maximum in doing non-exempt work. His duties and abilities were unique and different from those of anyone else in the building. He was properly classified as exempt.

*Harry F. Brown and Walter Hakanson.*

Both of these men were in the inspection department and at different times held titles of Inspector I, and II, and Brown the title of Inspector III. An Inspector I had complete charge of the Inspection Department in a building for one shift. His duties included the training and placement of personnel, requisitioning help, initiating disciplinary actions and rating personnel, and in general he was responsible for the inspection processes on that shift. An Inspector II was something of a coordinator among the three shifts and acted as an assistant to the Inspector III. An Inspector III was the head supervisor of the inspection department in the building, similar to the superintendent in the production department.

The inspection department was a separate department of defendant's operations. It was independent of production and acted as a check thereon. There were some 300 inspectors under plaintiff Brown at one time. The primary work of all inspectors was to spot-check on production by taking samples of the components as they came from the production machines and either inspect them physically for patent defects or by using gauges to determine whether they met ordnance specifications. This work was of a routine nature and was done mostly by girls, one of whom gave an adept demonstration in the court room. From time to time both of these plaintiffs performed the same mechanical operations as did the girl "line inspectors." But I cannot conclude it was "work of the same nature" within the meaning of the regulations. Both of these plaintiffs as part of their regular duties went from department to department to check the work being done by their subordinates. There was no other way they could adequately supervise that work than by occasionally re-checking the work done by the line inspectors. While mechanically the same, it was a part of and incidental to the supervisory work. Both of these plaintiffs were highly skilled and had considerable inspection experience before being given the responsible positions they held. When there was doubt as to whether a group of components should pass inspection, these plaintiffs had the responsibility of making the determination. This involved the exercise of judgment and discretion in the highest degree. Their salaries reflected this responsibility, Hakanson receiving more than $350 and Brown more than $400 a month. The credible evidence refutes their contention that 20% of their work consisted of that of the same nature as the non-exempt inspectors. They were both properly classified as exempt.

*Walter W. King.*

This plaintiff was chief of the fire department at the Twin Cities Ordnance Plant. In this State only the fire departments of Minneapolis and St. Paul are larger than defendant's organization. King had served thirty years on the Minneapolis force and had been deputy fire chief. Due to this long experience King was employed by defendant to organize fire protection for the entire plant. That he did a good job is evidenced by the small number of fires and relatively insignificant fire loss. He interviewed and approved each new employee in the department and his recommendations as to transfer and promotion were given considerable if not controlling weight. His testimony that he exercised no discretion and spent half his time doing the same work as the other firemen, is entirely beyond credence, is against the weight of the evidence, and is contradictory. It is a disturbing commentary on human nature to hear testimony of this character. Otherwise honorable and respectable citizens seemingly, at times, lose their perspective when they become plaintiffs in litigation of this kind. It is difficult to see what reasonable justification there was for bringing a suit in behalf of this plaintiff. He was obviously correctly classified.

*Frode Anderson.*

This plaintiff was general foreman of the loading department in a production building. The loading department is a recognized sub-division of the production department. As the name implies, his work was concerned with the loading of the ammunition and powder. This was largely a machine operation. The non-exempt employees were classified as machine operators, adjusters and powder handlers. Each shift, of which there were three when the plant was on a twenty-four hour schedule, had a shift foreman in charge. The general foreman was in charge of all shifts in the department and the shift foreman reported to him. He in turn was responsible to the production superintendent. He had no regular hours of work but arranged his time to supervise the activities of all shifts.

At one time this plaintiff had 130 subordinate employees. His salary ranged from $69.60 to $80.80 per week.

In addition the evidence shows that this plaintiff had a natural inventive flair and was a highly skilled technician. He spent a considerable portion of his time in improving the production methods and simplifying operations. Many of his suggestions and improvements were adopted by the company. There was no evidence that anyone else did work of this nature. Certainly the subordinate employees in the loading department did not. The defendant has sustained the burden of proving this employee was exempt.

### John B. Elliott and John F. Carlson.

Both of these men were shift foremen in the production department and Elliott was for a time general foreman. Elliott was in the "bullet draw" and "assembly" departments, Carlson in the "packing" and "guage and weigh" departments. They were paid at rates varying from $58.40 to $80.80 per week and both had worked as hourly paid employees before being promoted to foremen. The work in all of these departments is done principally by machinery. The work of a shift foreman differed in degree but not in kind from that of a general foreman. Each shift was independent of the others and qualifies as a sub-division of a department within the meaning and intent of the regulations. The foreman was directly in charge of the employees on his shift. He was their immediate supervisor. He rated the non-exempt employees, trained them or supervised their training. He had the responsibility for enforcing company rules, particularly with reference to safety. He had authority to recommend the disciplining of the employees and in general was directly responsible to the general foreman for the production of his shift. His duties and authority embraced the continued exercise of judgment and discretion.

There is a conflict in the evidence as to the amount of time these as well as other plaintiffs spent in work of the same nature as the non-exempt employees under their direction. Much of this evidence is unreliable because of an apparent misunderstanding or misinterpretation by the witnesses as to what should be included as "work of the same nature." Although the periods in question antedated the trial by some two years, many of these witnesses testified glibly to exact percentages of the time each plaintiff spent in doing exempt and non-exempt work. Assuming that such witnesses were engaged in doing some work while they were in defendant's employ, it is difficult to conceive how there is sufficient foundation for such categorical opinions. In respect to similar testimony in a wage and hour suit against the contract operator of the Iowa ordnance plant, Judge Dewey said in Distlehorst v. Day & Zimmerman, D.C., 58 F.Supp. 334, 336:

"Percentages are difficult of determination where no records are kept and especially where all the witnesses know the percentages required, * * *."

There is the same difficulty here as most of the witnesses were apparently thoroughly rehearsed. Although it appears that these plaintiffs while acting as shift foremen assisted the ordinary employees particularly when a bottleneck developed, the weight of the credible evidence sustains the finding that defendant has met its burden of proof and that these plaintiffs did not spend more than 20% of their time in the work of the same nature as the non-exempt employees in their department and were therefore properly classified as exempt under the Act.

### George R. Johnson

This plaintiff was employed by the defendant for several years before the ordnance plant opened. He was a skilled machinist and was superintendent and general foreman of the maintenance department. The maintenance department is a separate and distinct unit of defendant's operations. It is concerned with the maintenance and repair as distinguished from minor adjustment of the heavy machinery. Its responsibility was to keep the machines operating. As head of this department Mr. Johnson was responsible only to the production manager of the entire plant. He was in complete charge of the maintenance activities in a building. He had a private office from which the work was assigned to the mechanics who worked under him. There is no substantial dispute that this plaintiff was in charge of his department, exercised discretion and directed the work of his subordinates. Like the other plaintiffs he testified to the contrary and that he was only a "messenger boy," although his salary exceeded $300 per month. Such testimony needs little comment.

On the issue of how much time he spent doing the same work as the other mechanics there is the usual conflict of evidence. It is clear that in case of trouble he directly supervised the work and that his subordinates consulted him as to the best way to do the particular job. This would be natural in view of his experience and his position and is not inconsistent with his exempt classification. Sometimes he would actively assist one of the mechanics in a particularly difficult situation but most of the time that he spent on the floor was in going from one job to another, which was proper and necessary in view of his supervisory duties. He was not engaged in the same work as the ordinary mechanics for any appreciable portion of his working time and was properly classified as exempt.

*Leo A. Day.*

This plaintiff held the title of Personnel Technician II. He was in charge of the personnel office in various production buildings. His office was separate from the production activities of the building. He was responsible for seeing that the company's personnel policies were followed and properly interpreted. He was assisted by clerks and stenographers and on the other shifts by Personnel Technician I, all of whom were classed as non-exempt. He performed the ordinary duties of a personnel man, which were non-manual in nature.

Defendant contends he was exempt as an administrative employee under the regulations. This regulation requires that to be exempt the employee must be one who is paid $200 per month salary and one "who performs only under general supervision responsible non-manual office or field work directly related to management policies or general business operations, along specialized lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment." 29 C.F.R. 541.2 (b) (2). Day's salary was $58.40 per week so the only real question is whether he exercised discretion and judgment. On this the Department of Labor Bulletin of October 24, 1940, entitled "Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition," is helpful. I quote:

"However, it may be reiterated here that a salary criterion constitutes the best and most easily applied test of the employer's good faith in claiming that the person whose exemption is desired is actually of such importance to the firm that he is properly describable as an employee employed in a bona fide administrative capacity. * * *

"Employees exempted by the second alternative in the definition are those who can be described as staff rather than line employees, or as functional rather than departmental heads. They include employees who act as advisory specialists to the management; many of them in the higher brackets are commonly described as consultants. * * *

"Also included in this group are persons who are in charge of a so-called functional department, which may frequently be a one-man department. The work of these employees is directly related to general business operations. Typical examples are such employees as bank tellers, credit managers, purchasing agents, buyers, safety directors, personnel directors and labor relations directors * * *".

█ It is apparent that the Administrator considered certain personnel directors to be within the intent of the administrative exemption. This plaintiff was directly concerned with management policy. Of course he could not ex parte change or initiate personnel policies but he did take an active part in making recommendations as to personnel procedures. He was something of a trouble-shooter and seemed to have capably performed his duties. That he was engaged in personnel work both before and after his employment at the defendant's plant, supports this. The fact that he received about $250 per month compared with the 76¢ or 88¢ per hour received by his subordinates, is also indicative of his position. It is my conclusion that this plaintiff's work required and that he did exercise his discretion and judgment within the meaning of the administrative definition and that he was properly classified. It is therefore unnecessary to consider whether he would have been exempt under the executive exemption.

*Joseph L. Graen and George F. Owens.*

█ Both of these men were shift foremen, Graen of the "wash and dry" and "IB and Tracer Charging" departments, and Owens of the "powder canning" department. Both admittedly spent considerable time doing manual labor of the same kind and nature as the other employees in their

departments. Graen operated furnaces, washed walls, swept floors and operated and adjusted machines. Owens canned powder, moved railroad cars, drove trucks, cleaned up powder and took inventory. The amount of time each spent in this work is in dispute and is largely a question of degree. Upon all the evidence I am not satisfied that defendant sustained its burden of showing that these plaintiffs spent less than 20% of their time in work of the same nature as the non-exempt employees. They are therefore entitled to recover under the Act and it is unnecessary to consider whether they met the other tests of exemption.

*Donald W. Stewart.*

 This plaintiff is still employed by defendant. He was shift foreman and general foreman of the "function and casualty" department. In this department the finished ammunition was tested by actually firing the cartridges and then inspecting the casing for defects. A report to the ballistics department was made for each round fired. The work in the department consisted of firing and care of the guns, inspecting the cases and making written reports. The testimony disclosed that the men in the department evolved a system whereby these duties were rotated among the gunners and that this plaintiff took his regular turn at the various duties that were performed by the other men. Defendant introduced a compilation which showed how many rounds each gunner fired in each day. This exhibit supports this plaintiff's contention that he took his regular turn with the others in firing the guns. It is my conclusion that Stewart spent more than 20% of his time at the same work as the gunners in his department. He does not qualify as an exempt employee, nor is defendant's contention that this plaintiff is a professional employee a valid one. Although he had had some experience with guns in the last war and was a rifle instructor in the Marine Corps, I am not convinced that his training meets the test of "a prolonged course of specialized intellectual training or study," or that his work at the plant was "predominantly intellectual and varied in character" within the meaning of the Administrator's definition. 29 C.F.R. 541.3. He was therefore improperly classified and must be paid for overtime. His recovery will be limited in this suit to the period ending December 23, 1944. Stewart's case is a good example of the unforeseen consequences of the application of the Fair Labor Standards Act. In Section 2 of that Act, 29 U.S.C.A. § 202, Congress expresses its finding that there exists in industries engaged in interstate commerce "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" and declares it to be the policy of this Act to remedy these unwholesome conditions through the exercise of the commerce power. It is difficult to see how anyone such as this plaintiff earning $75.20 a week, who is usually working forty-eight hours a week, is being paid a sub-standard wage that he cannot maintain a minimum standard of living. The employees under him received up to 92¢ per hour, or at the most $47.84 for a forty-eight hour week. Yet this plaintiff received not only a much larger salary for the same kind of work but now must be paid overtime and double damages, and his recovery is based on the fact that he did work for which he should have been paid not more than 92¢ per hour. At most defendant has improperly classified some of these plaintiffs. Had they been paid on an hourly basis with overtime, they would have received less than they did receive on a weekly salary basis. Under these facts the double damage provisions of the Act appear extremely severe. I cannot conceive that the Congressional intent in enacting this wholesome legislation, or the Administrator's regulations in interpreting it, encompassed any such result as we have here; but it is not for the courts to change the law but only to apply it.

 The hours worked by those plaintiffs entitled to recover will be determined by the defendant's time records which are in evidence. As above indicated, the computation of their damages will be determined by the application of the formula expressed in Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682. In making this computation the regular rate and overtime rate for each of the plaintiffs in each of the workweeks shall be computed to the tenth of a cent per hour as indicated in Snyder v. Wessner, D.C., 55 F.Supp. 971.

The defendant has already submitted Findings and Conclusions. Findings and Conclusions for the plaintiffs Graen, Owen and Stewart may be submitted by their counsel. The amount of attorney's fees will be left undetermined until the court

ascertains the amount of recovery of the plaintiffs Graen, Owens and Steward.

There will be an exception to the parties aggrieved.