ANDERSON et al. v. FEDERAL CARTRIDGE CORPORATION.
Civil Action No. 1109.

District Court, D. Minnesota, Fourth Division.
June 26, 1947.

Harrison E. Fryberger, Edward Callinan, and Frank Ryan, all of Minneapolis, Minn., for plaintiffs.

Victor E. Anderson, U. S. Dist. Atty., and Linus J. Hammond, Asst. U. S. Dist. Atty., both of Minneapolis, Minn., for defendant.

VOGEL, District Judge.

This might be termed a class action brought by a large number of former employees of the defendant under the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. Plaintiffs seek to recover unpaid overtime compensation, additional equal amounts as liquidated damages, plus attorneys' fees. The action was originally commenced in 1944. Numerous plaintiffs have been added to the case as it has progressed. By agreement, to convenience the Court and counsel, the plaintiffs have been classified into groups, each group being separately tried. Two of such groups have already been disposed of with various results as to the different plaintiffs appearing therein. Recovery has been allowed for some plaintiffs and denied as to others. See Anderson v. Federal Cartridge Corp., D.C. Minn., 1945, 62 F.Supp. 775, affirmed 8 Cir., 1946, 156 F.2d 681; Anderson v. Federal Cartridge Corporation, D.C.Minn. 72 F.Supp. 639. (Nordbye, J.)

So far as this Court is able to ascertain, in those groups so far disposed of, the defendant has waived the defense alleged in the answer that the defendant and plaintiffs were not engaged in interstate commerce or in the production of goods for interstate commerce. The answer, however, which is applicable to all of the numerous plaintiffs herein, contains the following allegations:

"8. Except as herein admitted, qualified or alleged, defendant denies each and every thing in said complaint contained and each and every part thereof.

"9. For a further and separate defense hereto, defendant specifically denies that it is, or at any of the times alleged in the complaint herein, engaged in interstate commerce or in the production of goods for interstate commerce.

"10. For a further and separate defense hereto, defendant alleges and states that in the event the Court should overrule the defendant in its contention and defense hereto that it at no time was engaged in the production of goods for commerce as above alleged, defendant herein alleges and states that at all times during the employment of plaintiffs said plaintiffs were employed in work that was exempt from the application of the Fair Labor Standards Act."

There is no admission in defendant's answer that the plaintiffs were engaged in interstate commerce, the production of goods for interstate commerce, or any work necessary for the production of goods for interstate commerce. Accordingly, the answer squarely raises that issue.

■ At the beginning of this trial, defense counsel gave notice to the plaintiffs in open court that the defendant intended standing on such defense and that accordingly plaintiffs would be put to their proof on that issue. During the trial of this case, the plaintiffs made motions, the effect of which was to move the Court to strike from the answer the defense that the defendant and plaintiffs were not engaged in interstate commerce, in the production of goods for interstate commerce, or any work necessary for the production of goods for interstate commerce. Plaintiffs insisted that the defendant having waived such defense in the prior group trials, it could not raise such defense here. I find no written or other stipulation to the effect that the defendant would waive such defense as to all plaintiffs, and my attention has been directed to nothing in the record or in the findings or opinions or orders of the other Courts who tried the other cases which would be binding upon the defendant herein in such respect. Generally speaking, coverage under the Act depends upon the activities of the different employees. Different groups might very well have different work to perform so that some might be engaged in interstate commerce or the production of goods for interstate commerce and others might not. It was therefore determined that

this case must stand on its own feet and be decided solely upon the evidence introduced here. The motions were accordingly denied and plaintiffs were compelled to introduce proof on the disputed question.

This, then, is the first group wherein a court has had an opportunity of passing upon the question of whether or not the plaintiffs were engaged in interstate commerce, the production of goods for interstate commerce, or engaged in work necessary for the production of goods for interstate commerce.

The facts, from the evidence, and from agreements between counsel, appear as follows:

· The defendant is a Minnesota corporation which, since 1922, has been engaged in the manufacture of small arms ammunition and shotgun shells at Anoka, Minnesota. In 1941, the defendant entered into a contract with the United States Government to erect a munitions plant to be located at New Brighton, Minnesota. Materials and machinery for the erection of the plant were to be acquired by the Government and shipped to the defendant at New Brighton. The defendant was the prime contractor, there being numerous other subcontractors under it. The contract carried a provision to the effect that upon orders from the Government the defendant would operate the plant. In other words, it was a "stand-by plant" to be operated when and if the Government determined operation was necessary.

Subsequently, such orders were given by the Government and the defendant completed and operated the plant at New Brighton. It was known as the Twin Cities Ordnance Plant.

In the early stages of the operation of the plant, the defendant was authorized to give orders for materials which came in from various parts of the United States. Subsequently, that was changed and the Government itself procured all material, allocating it to this and, it may be assumed, other like plants. From that time on, the only procuring or purchasing done by the defendant was of perishable tools such as dies, punches and gauges. Such perishable tools were procured in various parts of the United States. The defendant had numerous expediters who searched for such perishable tools and had them shipped to the defendant across state lines. It may be said that the defendant consistently acquired only perishable tools, and that the Government consistently supplied all other materials, machinery, etc.

The defendant was paid a fee for the management of the plant and a fee for each 1,000 shells accepted by the Government. The fee for the shells varied in accordance with the grade of ammunition produced. The plant, erected by the defendant for the Government and operated by the defendant for the Government, produced .30 and .50 caliber ammunition to be used solely by the Government for war purposes. There was, however, a reclamation department where the defendant re-worked ammunition shipped to it by the Government from various points, the exact sources not being disclosed by the evidence. The ground upon which the plant was located, the plant itself, all materials therein and all products produced were owned by the Government. In the erection of the plant in the first instance, the defendant was compelled to keep within the estimates of cost made by the Government. From time to time, the Government made deposits of money in a designated bank in an account entitled "Federal Cartridge Corporation—Twin Cities Ordnance Plant, New Brighton, Account No. 1." The defendant was authorized to draw against this account to pay its employees. The defendant was authorized to recruit the employees for the operation of the plant. The finished ammunition was accepted by the Government inspectors at the plant at New Brighton. The defendant, upon orders from the Government, loaded the ammunition into boxcars. Thereafter it would be shipped on regular Government bills of lading. In other words, acceptance of the finished products, namely, ammunition, was made at the plant at New Brighton, Minnesota. Thereafter, the Government exercised complete and absolute control as to its destination and use.

All scrap metals coming out of the plant were loaded by the defendant, but shipped

out of New Brighton, Minnesota, on Government bills of lading and at the direction of the Government, with the exception of some scrap which, in accordance with Government regulation, was sold on the spot to the highest of at least three bidders, who accepted delivery at the plants and paid the Governor therefor.

While the plant at New Brighton, Minnesota, known as the Twin Cities Ordnance Plant, was operated by the defendant, it was kept separate, distinct and apart from its original and continuing operation at Anoka, Minnesota. The defendant's plant at Anoka continued to make small arms ammunition and shotgun shells, but all of such products were taken by the Government, none being sold for civilian consumption.

The Government did not purchase munitions from the defendant at the New Brighton plant; nor did the defendant sell munitions to the Government or to any other party from the New Brighton plant. The Government at all times owned and controlled the plant, materials and finished products.

The Ordnance Department of the Army maintained a commanding officer and subordinate officers and personnel at the New Brighton plant, including inspectors who ultimately passed upon the ammunition accepted by the Government and then shipped out by it. The Chief of the Ordnance Department determined what the plant would make, determined all new projects and all new or changed specifications. In the payment of the defendant's employees, men from the Ordnance Department sat with the defendant's paymasters in order to check payrolls, the identity of employees, hours of work, etc.

Prior to putting the plant into operation, the Government required that some of the defendant's employees attend a school at Frankford Arsenal at Philadelphia. Such empolyees were paid and their expenses were paid by the Government.

The Government also maintained two large projects for the manufacture of artillery shells on its property at New Brighton. The defendant had nothing to do with the operation of such projects except-

ing only to furnish steam, electricity and some other local services.

The plaintiffs in the particular group now being tried were known as Unit I Inspectors. Generally speaking, a Unit I Inspector had charge of all other inspectors under him on a particular shaft of eight hours. Such inspectors under him consisted, first, of generals; under the generals there were leaders; and under the leaders there were process and line inspectors. With one or two exceptions, Unit I Inspectors had under their supervision and general control from approximately 60 to 150 other inspectors.

The inspection department had the duty of inspecting the various components as they went through the production line as well as the finished bullets at the line's end.

Plaintiffs Leroy E. Brenna, Henry M. Landrum, Ben C. Ruppelius, Perry E. Myklebust, George R. Gleason and Gilbert C. Buhrman concede through their counsel, Mr. Frank Ryan, that they were employed by the defendant in executive capacities, but claim that they spent more than 20 percent of their time performing work which was non-exempt under the Fair Labor Standards Act. The remainder of the plaintiffs, represented by Mr. Harrison E. Fryberger and Mr. Edward Callinan, deny that they were employed in executive capacities within the purview of the Fair Labor Standards Act, and, further, insist that they spent greatly in excess of 20 per cent of their time in the performance of non-exempt work.

Defendant is represented by Victor E. Anderson, United States District Attorney for the District of Minnesota, and by Linus J. Hammond, Assistant United States District Attorney. That fact may be of significance in that it indicates that the Government is the real party in interest. Recovery, or failure thereof, in this lawsuit will in no way affect the defendant. Any plaintiff's judgment must ultimately be paid by the Government.

At the close of the plaintiffs' case, the defendant moved for a dismissal on the grounds, first, that the plaintiffs failed to prove that they were engaged in activities

in interstate commerce; second, that the plaintiffs failed to prove that they were producing goods for interstate commerce as intended by the Fair Labor Standards Act, and the regulations prescribed therein; and, third, that on the evidence thus far introduced the Court would be bound to determine that the plaintiffs expended less than 20 percent of their time in the performance of non-exempt work and that, further, the claims of inspectors classed similarly to these plaintiffs were denied recovery in one of the earlier group trials herein before Judge Joyce. See Anderson et al. v. Federal Cartridge Corporation, D. C., 62 F.Supp. 775; affirmed 8 Cir., 1946, 156 F.2d 681.

Under the motion made, the Court must first determine whether or not the plaintiffs come within coverage of the Fair Labor Standards Act. If the plaintiffs were not engaged in "commerce" or in the "production of goods for commerce" or any work necessary for the production of goods for interstate commerce, the motion must be granted.

The courts who have thus far had the problem before them are not in agreement. The Circuit Court of Appeals of this Circuit has had no opportunity of determining the question. Two District Court opinions in this Circuit are in conflict. In the case of Timberlake et al. v. Day & Zimmerman, Inc., D.C.Iowa, 49 F.Supp. 28, the Court held, under circumstances similar to those here prevailing, that the Fair Labor Standards Act extended coverage to ordnance plant guards. In the case of Barksdale v. Ford, Bacon & Davis, Inc., D.C.Ark., 70 F.Supp. 690, the Court, in dealing with a like situation, exhaustively reviews decisions of courts in this as well as other circuits and comes to the opposite conclusion. The Seventh Circuit Court of Appeals, in the case of Bell et al. v. Porter et al., 159 F.2d 117, 118, concludes that "cost-plus-a-fixed-fee contractors with the Government, engaged in war production, are not agents of the Government and do not share the Government's sovereign immunities. Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615; Curry v. United States, 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9. And it has been held that the production of goods for interstate transportation by or for the Government is production for commerce within the meaning of the Act." The facts involved in that case were somewhat similar to those at bar. As indicated, the Court held that the Act applied but that the alleged overtime of the plaintiffs was, for reasons not material here, not compensable.

The most recent case on the subject, the opinion being received during the trial of this case, was decided by the Second Circuit Court of Appeals on June 9, 1947, in the case of Divins et al. v. Hazeltine Electronics Corporation et al., 163 F.2d 100. Such case holds that employees engaged in work on ships which would be instrumentalities of commerce, such as armed cargo transports and armed transports, were engaged in commerce, but that employees engaged in repairing or working on purely war vessels were not covered by the Act as such vessels would be instrumentalities of war, not of commerce. In that opinion, the Second Circuit Court failed to comment on the opinion of the Seventh Circuit Court of Appeals in the case of Bell v. Porter, supra.

The applicable portions of the Fair Labor Standards Act are as follows:

"No employer shall * * * employ any of his employees who is engaged in commerce or in the production of goods for commerce" without complying with the provisions of the Act. 29 U.S.C.A. § 207 (a).

" 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee *but shall not include the United States or any state or political subdivision of a State * * *.*" 29 U.S.C.A. § 203 (d). (Emphasis supplied.)

" 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, *but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof.*" 29 U.S.C.A. § 203 (i). (Emphasis supplied.)

" 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or any State to any place outside thereof." 29 U.S.C.A. § 203 (b).

In holding that employees engaged in working on ships of war were not engaged in commerce, the second Circuit Court of Appeals, in Divins et al. v. Hazeltine Electronics Corporation et al., supra, stated:

"But most of the vessels on the repair or servicing of whose equipment the plaintiffs did their work were war vessels operated by the United States or by allied nations in the prosecution of the war. In any realistic use of words such vessels would seem to be instrumentalities of war, not of commerce. It is true that warships transport men, munitions, food for crew and troops, and occasionally, perhaps, supplies for civilians; and they may at times transmit radio messages for civilians. See Ritch v. Puget Sound Bridge & Dredging Co., 9 Cir., 156 F.2d 334, 335. This literally satisfies the statutory definition of commerce, but such transportation or communication is merely incidental to the war purpose for which the vessel is actually being used. To hold that workmen who repair aircraft carriers, battleships, submarines or other types of vessels used as weapons of war are 'engaged in commerce,' stretches the quoted words, elastic though they be, beyond all reasonable limits. The test, as stated in McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538, 'is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it.' The district judge was of opinion that the plaintiffs' activities were too remotely related to the movement of commerce to be a part of it.

"We agree with this conclusion in so far as it applies to the work of repairing equipment on vessels of war. We disagree with it in respect to the work of repairing equipment on vessels which may properly be considered instrumentalities of commerce, such as 'armed cargo transports' and 'armed transports.' Such vessels, we think, may be regarded as engaged in commerce, even though the goods or persons they transport will be devoted to the war effort after arrival at destination."

Following the same reasoning, to hold here that employees who inspected ammunition being manufactured for use by the Government solely for war purposes were engaged in commerce or in the production of goods for commerce would be going far beyond any express or indicated legislative intent. Such a conclusion would give to the word "commerce" a meaning found neither in the statutory definition, supra, nor in its common usage.

The goods produced at the New Brighton plant consisted solely of ammunition and its sole purpose had to do directly with the prosecution of war, not of commerce. War is the very antithesis of commerce. As was said by Judge Caffey, in Divins et al. v. Hazeltine Electronics Corporation et al., D.C.S.D.N.Y., 70 F.Supp. 686, 689, affirmed 2 Cir., 163 F.2d 100:

"Prosecution of a war is not commerce. War is the negation of commerce. Often the purpose of a war and the result, usually, is to impair or destroy commerce, not to carry it on. True, in the prosecution of the war warships transport men, munitions, food for crew and troops and supplies for civilians. Literally speaking, this is commerce but it is purely incidental to the main purpose for which the warships are being used."

In the instant case, there was but one purpose and but one use for the cartridges manufactured. There was no use incidental to the main purpose for which they were produced. Clearly, the products were solely for war and not for commerce.

It will be further noted that under the statutory definition of "goods," supra, Congress excluded " * * * goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer or processor thereof."

The evidence in the case at bar indicates that all of the ammunition produced at the defendant's plant, and inspected by the plaintiffs herein, was placed in the actual physical possession of the Government and that the Government was the ultimate con-

sumer thereof. When such finished products were accepted by the Government, they were completely and permanently removed from the channels of commerce. They were then in the hands of the "ultimate consumer"—namely, the Government, which is not shown to be either a "producer, manufacturer, or processor thereof" within the meaning of the Act. There could be no other "consumer," unless one might so designate the armed forces of our nation's enemies. I indulge in no such vapid interpretation. We consume our ammunition. It is not consumed by the objects at which it is directed. The manufactured products here were to be ultimately consumed solely by the Government in the prosecution of the war and accordingly come clearly within the statutory exclusion and are not "goods" within the meaning of the Act. Defendant's motion must accordingly be granted.

Counsel for the defendant will prepare and submit proposed findings of fact, conclusions and order consistent with the foregoing. Copies thereof shall be served upon counsel for the respective plaintiffs, who may have ten (10) days subsequent to the time of such service within which to make objections thereto.