**KENNEDY et al. v. SILAS MASON CO.**
No. 1594.

District Court, W. D. Louisiana,
Shreveport Division.
Nov. 6, 1946.

Turner Morgan, of Shreveport, La., for plaintiffs.

Cook, Clark & Egan, M. E. Lafargue, U. S. Atty., and W. L. Fleniken, Asst. U. S. Atty., all of Shreveport, La., for defendant.

DAWKINS, District Judge.

Plaintiffs sued for overtime, penalties and attorneys' fees, which they claim to be due under the Fair Labor Standards Act of June 25, 1938, C. 676, Sec. 16, 52 Stat. 1069, Title 29 U.S.C.A. § 216, alleging that they had been employed in interstate commerce and in the production of goods for commerce within the meaning of Section 3, Title 29 U.S.C.A. § 203, of said statute. The complaint admits that plaintiffs were paid all their wages at what appear to have been very liberal rates for straight time for the hours they worked.

Defendant has moved for summary judgment, for the rejection of the demands, contending that, under the undisputed facts and the law applicable thereto, plaintiffs were neither engaged in commerce nor the production of goods for commerce. In support of its motion, defendant offered the affidavit of its vice-president and general manager, one R. L. Telford, to which was attached the contract between it and the Government covering the operations involved. Telford's affidavit is quoted as follows:

"That Silas Mason Company constructed and later operated the Louisiana Ordnance Plant under the terms of a contract with the United States of America, a copy of which is filed in the proceeding hereinafter mentioned.

"That construction of the Plant under the terms of the said contract began on or about the 7th day of July, 1941, and that operation of the Plant began on or about the 4th day of March, 1942.

"That deponent has been connected with the Silas Mason Company in an official capacity from a time long prior to the execution of the contract, above referred to, to the present time; that he was General Manager of the work performed by the Company under the said contract from the beginning of the construction to the 9th day of June, 1943; and was both General Manager as above stated, and Vice-President of the Silas Mason Company thereafter until a time subsequent to August 23, 1945, the date of the filing of Civil Action No. 1594 on the docket of the United States District Court for the Western District of Louisiana, Shreveport

Division, entitled 'Harris Kennedy, et al., vs. Silas Mason Company.'

"That at all times involved in the complaint of complainants in the proceeding just above mentioned, the premises upon which the complainants were employed, the tools and equipment which they were using in their employment, and the property and products with which they dealt in such employment, were all the property of, and belonged to, the United States Government; that the component parts of the shells, grenades, mines, fuses, bombs, and other products with which all of the Complainants dealt were shipped to the Louisiana Ordnance Plant as property of the Government and the finished product, as property of the Government, was, by its direction, shipped out of the said premises for use by its Armed Forces in its War effort in the War with Germany, Japan, Italy, and other Nations; that at all times involved in the proceeding above mentioned, Silas Mason Company was operating the Louisiana Ordnance Plant, Shreveport, Louisiana, under the contract above mentioned, which is a cost-plus-a-fixed-fee contract with the United States Government, and under which contract the United States Government obligated itself to pay the Silas Mason Company a fixed fee for operating the said Plant, plus all expenses in connection with the operation thereof.

"That there were no rules, regulations, wage scales, or wage classifications promulgated for Silas Mason Company requiring that complainants in the above numbered proceeding be compensated for all hours in excess of 40 at time and one-half and at double time for all work performed on Sundays and Holidays; and there was no custom of Silas Mason Company involving or requiring such compensation to complainants, or persons similarly situated."

The contract is typical of many others that were entered into by the Government preceding and during World War II. The undisputed facts are that defendant, Silas Mason Co., Inc., hereafter called the contractor, agreed to build an ordnance plant near Minden, Louisiana, to train key personnel and to operate the plant in the manufacture of shells and munitions to be used in prosecuting the war. It was what is known as a "cost-plus-a-fixed-fee" arrangement, which meant that the Government was ultimately to reimburse the contractor for all sums spent under the contract. At all times, the title to all property, tools, materials and supplies placed or delivered upon the project was in the United States. However, the latter was not to be directly liable for any of the obligations of the contractor, although everything was to be under the control of the War Department, when necessary to exercise it. All the finished products were shipped out of the plant under the Government's directions for the use of its armed forces and those of its Allies. All employees save those of the War Department were hired and their compensation fixed by the contractor, subject to the veto of the army officer in charge.

The contract was divided into seven titles, and these in turn, into articles and subsections. Title I was headed "Design, Construction and Engineering"; Title II "Procurement of Production Equipment"; and Title III "Training of Key Personnel." Each of these three titles had a subsection labeled "Eight Hour Law and Overtime Compensation" found in Article I-G of Title I, reading as follows:

"No laborer or mechanic doing any part *of the work contemplated by this Title I,* in the employ of the Contractor or any subcontractor contracting for any part of said work contemplated, shall be required or permitted to work more than eight hours in any one calendar day upon such work at the site thereof, except upon the condition that compensation is paid to such laborer or mechanic in accordance with the provisions of this Article. The wages of every laborer and mechanic employed by the Contractor or any subcontractor engaged in the performance of this Title I shall be computed on a basic rate of eight hours per day and work in excess of eight hours per day is permitted only upon the condition that every such laborer and mechanic shall be compensated for all hours worked in excess of eight hours per day at not less than one and one-half times the basic rate of pay. For each violation of the requirements of this Article a penal-

ty of five dollars shall be imposed upon the Contractor for each laborer or mechanic for every calendar day in which such employee is required or permitted to labor more than eight hours upon said work without receiving compensation computed in accordance with this Article, and all penalties thus imposed shall be withheld for the use and benefit of the Government: *Provided,* That this stipulation shall be subject in all respects to the exceptions and provisions of U.S.C.A., title 40, Sections 321, 325, 324, and 326, relating to hours of labor, as in part modified by the provisions of Section 5(b) of Public Act No. 671, 76th Congress, approved June 28, 1940 [50 U.S.C.A.Appendix, § 1155(b) ], and Section 303 of Public Act No. 781, 76 Congress, approved September 9, 1940 [40 U.S.C.A. § 325a], relating to compensation for overtime."

The last articles of Titles II and III (being II-D and III-D) declared that "the provisions of Article I-G (with respect to the eight hour law and overtime) of Title I shall be applied to the work" under Titles II and III.

It is unnecessary to consider other acts of Congress enumerated in Article I-G, since none of the claims of either this suit or some twenty others of the same nature arose out of either "design, construction and engineering", "procurement of production equipment", or "training of key personnel."

When we come to Title IV, "Operation of Plant (Optional)", we find that Article IV-A provides:

"7. In carrying out the work under this Title IV the Contractor is authorized and shall do all things necessary or convenient in the operating and closing down of the Plant, or any part thereof, including (but not limited to) the employment of all persons engaged in the work hereunder *(who shall be subject to the control and constitute employees of the Contractor),* the providing of all materials and supplies except such as the Government is to furnish or supply as elsewhere specifically provided herein, the storage of materials and supplies and the finished products to the extent of the storage facilities at said Plant, the preparation of the product for shipment and the loading of same on cars or other carriers in accordance with the Government's shipping instructions."

Article IV-D makes applicable provisions of the Walsh-Healey Act of June 30, 1936, 49 Stat. 2036, Title 41 U.S.C.A. §§ 35-45, but it has no application to these cases. Subsection IV-h-2 recites that "paragraph *b* of Sec. 1 of this article, IV-D, with respect to wages, is inoperative due to lack of determination by the Secretary of Labor of prevailing minimum wage rates for the industry involved." Subsection b of Section I of Article IV-D, after having declared in subsection *a* that Silas Mason was "a manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured, or used in the performance of the contract", declared that the provisions of the Walsh-Healey Act should apply to "all persons employed by the contractor in the manufacturing or furnishing of all materials, supplies, articles, or equipment *used* in the performance of the contract", who shall be paid as provided by that statute. The effect was to first write into and then write out of the contract the Walsh-Healey Act, not as to the operations of the ordnance plant, but as to plants or facilities of the contractor insofar as supplies and materials furnished by it. The other titles and articles of the contract are not pertinent to the issues presented here.

As against the affidavit of Telford and the contract, plaintiffs offered by reference affidavits of Guy W. Harkness, N. K. Kavanaugh and Bryant Hammontree, former employees of the contractor, submitted in other cases. The pertinent portions of the affidavit of the last mentioned witness, which are typical of all the rest, is quoted as follows:

"That he has personal knowledge of all the facts hereinafter recited in this affidavit.

"That this affiant was first employed by the Silas Mason Company in the construction of the Louisiana Ordnance Plant and began his duties on or about August 24, 1941; that his employment with said com-

pany continued from that date until the completion of said plant.

"Affiant further states that during this time when the plant was being constructed, that overtime pay of one and one-half the normal rate was paid and double time was paid for Saturdays, Sundays and holidays, that after the Executive Orders were issued by the President of the United States, that overtime pay of one and one-half was continued but that double time pay for Sundays and holidays did not apply unless the worker had worked seven consecutive days, under which conditions he then received the double time for the seventh day.

"That this affiant continued to work for Silas Mason Company in the operation of the Louisiana Ordnance Plant in which ammunition, shells, bombs, etc., were manufactured and shipped out of the state and to foreign parts; and also during the time that commercial fertilizer was manufactured and shipped in commerce. That during this period of time all laborers and mechanics were paid a stipulated wage per hour for a forty-hour week and were paid one and one-half times their stipulated wage for overtime exceeding 40 hours per week. That this was the common accepted policy of the Silas Mason Company in the construction and operation of the Louisiana Ordnance Plant.

"Affiant further states that the Silas Mason Company was the sole operator of said plant; that their authority covered the hiring and firing of all employees, the actual doing of the work and the manufacturing of the products, and that insurance was carried to cover the men from injury, and that the only part that this affiant knew that the United States Government played at this plant was that they had a force of employees engaged directly by the Government and independent of the Silas Mason employees, which employees were directly under the Government supervision, were paid by the Government and worked as supervisors, checkers, auditors, and in other capacities. That the Government employees and the Silas Mason employees were entirely separate and were each paid by their respective employers.

"This affiant further states that his checks were signed by Silas Mason Company through their officials and were drawn on the Silas Mason account in designated banks, and that he received no pay directly from the United States Government.

■ Of course, if commercial fertilizer was made, sold and shipped in interstate commerce, in sufficient quantities, along with the production of munitions of war for the Government, employees working in that part of the enterprise might be entitled to invoke the provisions of the Fair Labor Standards Act. However, the benefits of that type of employment could be claimed only by those who were so engaged and they would have to allege and prove it. Otherwise, the general principles of law applicable under the contract, the nature of the work and the relationship of the Government thereto would govern. With respect to the statements in those affidavits that overtime had been paid the employees, (which they do not say was paid to these particular employees, or whether it was paid under the first three titles of the contract) this would become important only in event it were found the matter was controlled by the contract and that its meaning was doubtful. In such cases, the manner in which the parties thereto had construed and applied it would help to overcome ambiguity. On the other hand, if, as a matter of law, the Fair Labor Standards Act had no application, such evidence would not help the situation, even if overtime had been paid in some instances. What has just been said applies also to the express provisions as to wages, hours, overtime, etc., dealt with in the first three titles, and omitted in all the rest. In other words, it might be said to be significant that the contract sought to apply the Fair Labor Standards Act to these three titles and hence to relieve from the provisions of that law operations under the fourth and succeeding titles.

It is my view that the issue is simply one of law.

The Act of June 25, 1938, C. 676, 52 Stat. 1060, Tit. 29, §§ 201–219, U.S.C.A., did the somewhat unusual thing of first announcing findings and then declaring the policy

of Congress with respect to labor relations. The findings were (202(a) that conditions theretofore existing in *"industries* engaged in commerce or in the production of goods for commerce" (emphasis by the writer) produced some five enumerated results, affecting interstate commerce and that (202(b) "the policy of sections 201-219 of this title" was "to correct and as rapidly as practicable to eliminate the conditions" so found. Section 203 defines at length the meaning of words, phrases and terms used in the statute. Subsection (a): " 'Person' means an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."

Subsection (d): " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but *shall not include the United States or any State* or political subdivision of a State, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."

Subsection (e): " 'Employee' includes any individual employed by an employer."

Subsection (h): " 'Industry' means a trade, business, industry, or branch thereof, or group of industries, in which individuals are gainfully employed."

Subsection (i): " 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

Section 206 of said title prescribes the minimum rates and 207 the maximum hours of labor. The latter declares, in substance, that "no employer shall" require an employee to work more than a specific number of hours (at the time involved here 40) per week "unless such employee" is paid "one and one-half times the regular rate" per hour of his employment.

Section 213 provides certain exemptions but none have application here.

Section 215 makes it unlawful "to transport, offer for transportation, ship, deliver, or sell in commerce, * * * any goods in the production of which any employee was employed in violation of section 206, or section 207, * * * or in violation of any regulation or order of the Administrator * * *."

Section 216 declares: " * * * (b) Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. * * * The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

██ Thus it is seen that the entire statute sought to deal with private business and industry, expressly excluding the governments of the United States, of the several states and their subdivisions. In subsection 202(a) the findings of Congress were as to *"industries engaged in commerce,"* and subsection 203 declares that " 'Industry' means a trade, business, industry, or branch thereof, or group of industries, in which individuals are gainfully employed." (Emphasis by the writer.)

██ It can scarcely be said that the activities of a government constitute "industry" within the definition of that word provided by the statute. The primary purpose and excuse for its existence is the government of its people, including their protection from within and without. It does not exist for the purpose of affording gainful employment for anyone. Such officers and employees as are provided, presumably, at least, are to enable it to discharge its duties as a sovereign, and not to carry on a business for profit. Congress, of course, recognized these indisputable principles and confined the provisions of the Fair Labor Standards Act to private industry.

582

Starting, therefore, from this premise we approach the present cases with a clear duty not only to exclude from application of the statute the business and operations of the Government but with the further settled jurisprudence that the Government shall not be bound by any such measures unless specifically included by unmistakable terms. United States v. Hewes, 26 Fed. Cas. 297, No. 15,359; Dollar Savings Bank v. United States, 86 U.S. 227, 22 L.Ed. 80.

Now, let us analyze the situation as it existed at this and similar plants. Plaintiffs contend that notwithstanding the circumstances revealed by the contract and the nature of the work performed, both they and the contractor were engaged in interstate commerce and the production of goods for commerce, as much so as if the enterprise had been owned and operated for private gain; while defendant argues that the production and transportation of munitions of war for and by the Government under the circumstances of these cases, regardless of whether they were made from materials which passed from one state to another was not commerce within the meaning of the law, but activities of the Government as a sovereign in the prosecution of war.

Cases from the lower Federal courts are cited by either side but none of them, to my mind, is conclusive, and I shall not attempt to review them. Had defendant been engaged in the business of manufacturing munitions of war, either as a general proposition, or under contract by which it agreed to produce and sell to the Government, either at fixed prices or at prices to be set from time to time, the situation would have perhaps been different, and the Fair Labor Standards Act as well as other laws pertaining to labor, prices, material, etc., might have come into play. Overtime and other expenses of the producer or manufacturer from whom the Government purchased would simply have been added to the prices which the Government had to pay, just as was done when it purchased materials, supplies, etc. for carrying on the war. In this latter situation both the employers and employees who made the goods, although for the Gov-

ernment, were engaged in commerce, within in the meaning of the law, where the goods moved from one state to another or overseas. On the other hand, in these cases and all others like them where the Government, instead of going into the market and paying for manufactured or raw materials, chose to furnish its own materials and to have its munitions made and shipped from its own plants, paying all expenses in the form of reimbursements to the contractor, plus a fixed fee for the latter's knowledge and skill in the operation of the plants, although declining to become responsible directly for labor, materials or other obligations of the contractor, it is my view, that the same did not constitute commerce. Of course, the Fair Labor Standards Act and all other laws did apply to purchases from private concerns of raw materials of unfinished parts and supplies from which the shells and munitions were made, before they were delivered to the Government, and in those cases where they had to move from one state to another for delivery to the Government. At the same time the finished shells and munitions made at the plant were the Government's property at all times and were physically delivered to it there before being shipped to the battlefronts.

I can not conceive that because the Government saw fit to employ a contractor, either individual or corporate, in the emergency of war, to build and operate a factory for the production of war munitions out of its own materials, upon lands bought or condemned, under its sovereign power, that such a course could be said to affect the fundamental fact that the enterprise was wholly that of the Government itself. I believe that this is one of the instances where the courts should look through forms and consider substance.

However, after reaching what is thus believed to be a correct conclusion as to the inapplication of the Fair Labor Standards Act to these cases, we are confronted with the fact that the contract or agreement with defendant shows on its face that it was entered into by the War Department under the authority of the Act of July 2, 1940, Public No. 703, 54 Stat. 712, entitled "An Act to expedite the strengthening of

the national defense." Pertinent provisions of the act are as follows:

Sec. 1, 50 U.S.C.A.Appendix, § 1171. That (a) "In order to expedite the building up of the national defense, the Secretary of War is authorized, * * * for national-defense purposes for the fiscal year ending June 30, 1941, * * * (1) to provide for the necessary construction * * * and installation * * * of plants, buildings, facilities, utilities, and appurtenances thereto * * * for the development, manufacture, maintenance, and storage of military equipment, munitions, and supplies, * * *; (2) to provide for the development, purchase, manufacture, shipment, maintenance, and storage of military equipment, munitions, and supplies * * *; and (3) to enter into such contracts * * * as he may deem necessary to carry out the purposes specified in this section."

Subsection (b) of Sec. 1 further provided: "The Secretary of War is further authorized, * * * *to provide for the operation and maintenance* of any plants, buildings, facilities, utilities, and appurtenances thereto constructed pursuant to the authorizations contained in this section and section 5, either by means of Government personnel or *through the agency of selected qualified commercial manufacturers under contracts entered into with them*, * * * under such terms and conditions as he may deem advisable * * *." (Emphasis by the writer.)

Subsection 1(c): "Whenever, prior to July 1, 1942, the Secretary of War deems it necessary in the interest of national defense, he is authorized, from appropriations available therefor, to advance payments to contractors for supplies or construction for the War Department in amounts not exceeding 30 per centum of the contract price of such supplies or construction. * * *."

Section 4(b), 5 U.S.C.A. § 189a, is quoted as follows: "(b) Notwithstanding the provisions of any other law, the regular working hours of laborers and mechanics employed by the War Department, who are engaged in the manufacture or production of military equipment, muni-

tions, or supplies shall be eight hours per day or forty hours per week during the period of any national emergency declared by the President to exist: Provided, that under such regulations as the Secretary of War may prescribe, such hours may be exceeded, but compensation for employment in excess of forty hours in any workweek, computed at a rate not less than one and one-half times the regular rate, shall be paid to such laborers and mechanics."

Section 5, 50 U.S.C.A.Appendix, § 1172: "The President is authorized * * * (3) to provide for the procurement and training of civilian personnel necessary in connection with the protection of critical and essential items of equipment and material and the use or operation thereof; * * *."

In view of this statute, and the provisions quoted, the question is, whether, within the fair intendment and meaning thereof, the operation of the plant in this case *"through the agency* of (defendant) selected qualified commercial manufacturer, under contracts entered into with them" placed the plaintiffs within the terms of section 4(b) "of laborers and mechanics employed by the War Department * * *."

Having reached the conclusion (which seems further fortified by the provisions of this statute) that the whole enterprise was that of the Government, notwithstanding the interposition of the defendant as contractor, it would seem to follow, inescapably, that laborers at this plant were in reality employed for the Government, and in their hours of labor, were protected by the quoted provisions of said section 4(b). However, this can not have the result of bringing the matter under the Fair Labor Standards Act. The rights of the plaintiffs and of other "laborers and mechanics" so employed were governed by section 4(b) of the Act of July 2, 1940, referred to above, which limits the rates for overtime to one and one-half times their regular hourly compensation, and excludes the penalties of an additional equal amount and attorneys' fees.

As to any commercial fertilizer which may have been made at the plant, those employees performing such work, while

so engaged, if of sufficient magnitude to form an important part of the enterprise, by proper allegations might invoke the provisions of the Fair Labor Standards Act to the extent only that such fertilizer was involved.

The motion for summary judgment should be denied.

Proper decree should be presented.