BROWN et al. v. CONSOLIDATED VULTEE AIRCRAFT CORPORATION.

No. 1067.

United States District Court
W. D. Kentucky, at Louisville.

Sept. 21, 1948.

Greenberry Simmons and Horace M. Barker, both of Louisville, Ky., for plaintiffs.

John E. Tarrant, Jack J. Heath, Ogden, Tarrant, Galphin & Street, all of Louisville, Ky., and Raymond S. Pruitt, H. Preston Coursen and Pruitt, Desvernine, Hale & Coursen, all of New York City, for defendant.

SHELBOURNE, District Judge.

Fifty-one foremen and assistant foremen, former employees of the Consolidated Vultee Aircraft Corporation, filed this action February 26, 1946, seeking to recover overtime pay under the Fair Labor Standards Act, Title 29, U.S.C.A. §§ 201–219 for various periods of time between July 5, 1943, and August 31, 1945. The defendant on June 27, 1947, filed its answer and counterclaim. The case was tried to the Court without a jury after pre-trial conferences, the actual trial consuming practically four weeks, resulting in introduction of testimony covering 2,364 pages of transcript.

The defendant entered into a contract with the United States under date of September 28, 1942, by which, in consideration of a fixed fee and reimbursement for cost, the defendant undertook the operation of a modification center near Louisville in Jefferson County, Kentucky. The plant, equipment machinery, and parts necessary for the operation were owned and furnished by the Government. The airplanes were owned by the Government, were delivered to defendant at the modification center and there delivered back to the Government upon completion of modification in accordance with the plans and specifications and were flown from the plant to the various war centers at which they were to be used during the progress of the war.

The questions involved in the case are:

First: Were the plaintiffs engaged in interstate commerce or in the production of goods for commerce?

Second: Was the employment and work of the plaintiffs controlled by the Walsh-Healey Act, 41 U.S.C.A. § 35 et seq., rather than the Fair Labor Standards Act?

Third: Were the plaintiffs exempt from the overtime provisions of the Fair Labor Standards Act because they were within the exemptive provision of that Act as bona fide administrative or executive employees?

Fourth: Did the defendant in good faith rely upon rulings, approvals, practices, and interpretations of the Fair Labor Standards Act concerning the status of the plaintiff employees to the effect that the plaintiffs were bona fide administrative or executive employees so as to exempt the defendant from liability in this case under Section 9 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 258?

Fifth: Did the defendant in good faith and upon reasonable grounds, believing that the Fair Labor Standards Act was not applicable to the plaintiff employees, thus employ and work the plaintiffs in the belief they were exempt from the overtime provisions of the Fair Labor Standards Act as administrative or executive employees and thereby become exempt from the payment of liquidated damages should it be determined that the plaintiffs are entitled to compensation under the Fair Labor Standards Act under Section 11 of the Portal-to-Portal Act, 29 U.S.C.A. § 260?

Sixth: Since the plaintiffs were employed at a flat salary and in addition paid a bonus, if liable to plaintiffs, how the additional compensation is to be determined, defendant claiming that the amount would be determined by multiplying the number of hours over forty worked by each foreman in each particular week by one half of that foreman's regular rate of pay for that particular week, determined by dividing his total compensation for that particular week by the number of hours worked by him.

Seventh: If it is determined that the plaintiffs were not exempt under the Fair Labor Standards Act as administrative or executive employees, is the defendant entitled to offset the amount finally determined to be due the plaintiffs by the total amount of the incentive bonus paid to that particular employee?

Article 18 of the contract entitled "Eight Hour Law—Overtime Compensation" is as follows: "No laborer or mechanic doing any part of the work contemplated by this contract, after the date or execution of this contract, in the employ of the Contractor or any subcontractor contracting for any part of said work contemplated, shall be required or permitted to work more than eight hours in any one calendar day upon such work at the Center, except upon the condition that compensation is paid to such laborer or mechanic in accordance with the provisions of this Article. The wages of every laborer and mechanic employed by the Contractor or any subcontractor engaged in the performance of this contract, shall be computed on a basic day rate of eight hours per day, after the date of execution of this contract, and work in excess of eight hours per day is permitted only upon the condition that every such laborer and mechanic shall be compensated for all hours worked in excess of eight hours per day at not less than one and one-half times the basic rate of pay. For each violation of the requirements of this Article a penalty of five dollars shall be imposed upon the Contractor for each laborer or mechanic for every calendar day in which such employee is required or permitted to labor more than eight hours upon said work after the date of execution of this contract, without receiving compensation computed in accordance with this Article, and all penalties thus imposed shall be withheld for the use and benefit of the Government; Provided, that this stipulation shall be subject in all respects to the exceptions and provisions of U. S. Code, Title 40, Sections 321, 324, 325, and 326 [40 U.S.C.A. §§ 321, 324, 325, 326], relating to hours of labor, as in part modified by the provisions of Section 303 of Public Act No. 781, 76th Congress, approved September 9, 1940 [40 U.S.C.A. § 325a], relating to compensation for overtime."

The modification plant had many departments. When a particular plane was delivered at the center, the modification to be made in intricate detail was prepared by the Engineering Department together with designs, drawings, and specifications, all of which was bound together and known and referred to in the record as

the "Bible". There was a Bible for each plane.

The Tooling Department provided for the making of such parts as were necessary to be made, a great many of the parts being Army and Navy standard parts.

The Production Department prepared the necessary shop orders for the actual procurement of the parts.

A Fabrication Department for the fabrication of certain parts, Tube Bending Department, the Sheet Metal Shop, and a Machine Shop provided, in the main, the various departments.

The planes were first brought to the rear of the hangar where there were four stations at which the plane was stripped of such portions as was necessary for the modification. The four outside stations are referred to as "tear out stations". Within the hangar there were stations 5 to 12, inclusive. Stations 5 to 10 are referred to as "installation stations" and 11 and 12 the "shake down" where inspection was made to see that the plane had been modified as required by the Bible. Station 13 was located outside the hangar and in the event the modification had not been completed, due to shortage of material or lack of time for the required work on one or more stations inside the hangar, the work was completed and then delivered to the Air Forces of the Army after final inspection and proper tests had been made.

The planes moved single file, in two lines, through the various stations and were connected to a large cable, which, in turn, was attached to a tractor outside the hangar. When the work had been completed at the various stations or when the allowed time for the work had elapsed, the "line was moved". In moving the line it was necessary that two men guide each particular plane during the time it was being moved. Moving the line consisted in moving the planes from one to the next adjacent station.

At the various stations where the work was done, parts bins were located nearby, to which the necessary parts were brought and there installed upon the plane. Frequently, due to a shortage of parts or lack of them, the plane had to be moved along with the line to the adjacent station and it was then necessary for the workmen to follow the plane and complete the work or wait until the plane had been delivered to stations 11, 12 or 13 and there complete the work which had not theretofore been done.

One of the principal issues in this case is whether or not the plaintiffs as foremen and assistant foremen spent 20% or more of their time in doing manual work which the men under them were employed to do. There is a wide variance in the testimony of the plaintiffs as to the percentage of time they spent doing the same kind of work as that performed by the hourly employees in the plant, that variance extending from 25% to 80% of their total time.

The work they claim to have done constituting nonexempt work was described as "chasing parts", "checking part bins", "making installations", "cleaning out planes", "plugging in batteries and checking wires", "making parts", "dragging heaters to the plane on the outside of the hangar", "moving the line", and "opening and closing the doors of the hangar".

"Chasing parts" was explained as going to the Fabrication and Assembly Departments to learn the whereabouts and status of parts and to urge the completion of required parts and carrying the part, if it had been completed, to the modification line.

"Checking the part bins" consisted in checking the bins in the hangar to learn the whereabouts of necessary parts.

"Making installations", as testified to by the foremen, consisted in joining in with the hourly workers in doing the work inside and on the plane in order to meet the schedule.

"Cleaning out the planes" consisted in removing from the plane, when it was ready to leave a particular station or ready for inspection, the debris that had accumulated from the work.

The hangar doors had to be closed in stormy and cold weather. The doors were large, heavy and had to be opened and closed when the line was moved.

Several foremen testified that they went to the Fabrication Department and actually fabricated parts.

During the cold weather when work was necessary to be done in station 13 outside the hangar, foremen say that they were required to drag out the heaters and place them in the plane in order that sufficient heat could be placed in the plane to enable workmen to complete the work outside the building.

■ The first question to be determined is were the plaintiffs engaged in commerce or in the production of goods for commerce. It has been many times written that the Fair Labor Standards Act must be liberally construed and the exemptive provisions of the Act must be narrowly construed. A. H. Phillips, Inc., v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095, 157 A.L.R. 876; Fletcher, et al. v. Grinnell Brothers, 6 Cir., 150 F.2d 337.

■ The defendant has the burden of proof to establish the exemption claimed. Walling, Administrator, etc., v. General Industries Company, 6 Cir., 155 F.2d 711, affirmed by the Supreme Court 330 U.S. 545, 67 S.Ct. 883, 91 L.Ed. 1088.

The defendant contends that it was operating a service establishment for the Government; that all of the airplanes modified being owned by the Government and brought to the center by the Government and delivered back to the Government at the center forbids the work's classification as interstate commerce or the production of goods for commerce and relies upon Lynch et al. v. Embry-Riddle Co., D.C., 63 F.Supp. 992; Divins v. Hazeltine Electronics Corporation, D.C., 70 F.Supp. 686; Id., 2 Cir., 163 F.2d 100; Kruger v. Los Angeles Shipbuilding and Drydock Corporation, D.C., 74 F.Supp. 595; Anderson v. Federal Cartridge Corporation, D.C., 72 F.Supp. 644; Kennedy v. Silas Mason Co., D.C., 68 F.Supp. 576; Id., 5 Cir., 164 F.2d 1016, reversed and remanded to District Court May 17, 1948, for preparation, 334 U.S. 249, 68 S.Ct. 1031. Phillips v. Graham Aviation Co., 5 Cir., 157 F.2d 443; Hays v. Hercules Powder Co., D.C., 7 F.R.D. 747; St. Johns River Shipbuilding Co. v. R. A. Adams, 5 Cir., 164 F.2d 1012.

The plaintiffs, on the other hand, in support of their claim that they were engaged in the production of goods for commerce and subject to Fair Labor Standards Act, cite Walling v. Patton-Tulley Transportation Company, 6 Cir., 134 F.2d 945; Clyde et al. v. Broderick, 10 Cir., 144 F.2d 348; Roland Electrical Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383, and the interpretive bulletin of the Wage and Hour Division issued July 11, 1947, 12th F.R. 4583.

In the case of St. Johns River Shipbuilding Company v. R. A. Adams, 5 Cir., 164 F.2d 1012, 1015, the Court had under consideration whether the construction of tankers not fitted out or equipped as commercial vessels but designed and built for fighting in the Pacific and hopping from island to island carrying fuel from naval base to naval base and soldiers to the fighting fronts, said: "They were goods produced for war, not for commerce. War is not commerce. There can be commerce in war equipment, but when the government itself in the midst of war has produced for immediate use in war at its own expense and in its own shipyard special type vessels as auxiliaries for its navy and to be manned by navy crews, commerce is not involved at all. The Company and its employees knew it was not. The war power of the federal government is its supreme power. When it is in action it is transcendent. This work was not the time and place to bicker about overtime. The men who manned these boats got no overtime. They staked and often lost their lives."

On the same day in the case of Kennedy et al. v. Silas Mason Company, the same Court said, 164 F.2d 1016, 1017: "We are of opinion that transportation by the Government of Government owned munitions during war for use by its armed forces is not 'commerce' within the meaning of the Fair Labor Standards Act."

And further said: "Furthermore, if the defendant was an agent or instrumentality of the United States for the production only of munitions of war, whose employees

were paid with funds of the United States, whose hiring and firing had to be with the approval of the United States, who worked in a building belonging to the United States, on materials supplied by and belonging to the United States, and who turned out a product that at all times belonged to the United States, which was delivered without any trade or commerce or transportation occurring; then, under subparagraph (d) of Sec. 3, 29 U.S.C.A. § 203(d), whereby the United States is excluded from the operation of the Act, the Act would not be applicable."

This language is impressive, but the Court of Appeals of this Circuit, in the case of Walling v. Patton-Tulley Transportation Company, 134 F.2d 945, 949, said: "No reason appears why contractors for the Government are to be permitted to maintain sub-standard labor conditions while private contractors are prohibited from so doing, and such view would thwart the clearly defined purpose of the Congress, particularly if applied at a time when all, or nearly all, major industries are operating upon government contract." The definition of commerce in the Fair Labor Standards Act, Section 3(b) defines "commerce" as meaning " * * * transportation * * * from any State to any place outside thereof."

█ With this definition and considering that the planes were flown immediately after their completion by defendant from the City of Louisville to points outside the State of Kentucky, and further that the contract involved here specifically refers to the defendant as an independent contractor, and that the contracts on the basis of costs-plus-a-fixed-fee differ from other contracts largely in the method of payment, it seems more feasible that the work done by the plaintiffs in this case was the production of goods for commerce. See Jackson et al. v. Northwest Airlines, D.C.Minn., 75 F.Supp. 32.

█ The second question, whether the employment and work of the plaintiffs are controlled by the Walsh-Healey Act and thereby excluded from the provisions of the Fair Labor Standards Act, is also answered by the Sixth Circuit Court of Appeals in the case of Walling v. Patton-Tulley Company, supra, wherein it is said: "The argument that it was the Congressional intention to make the Fair Labor Standards Act inapplicable to work under government contract must be rejected."

The case of Bell v. Porter, 7 Cir., 159 F.2d 117, and the case of Jackson v. Northwest Air Lines, Inc., supra, are to the same effect.

The fact that the plaintiffs may have had or now have rights under the Walsh-Healey Act would therefore not preclude their seeking redress under the provisions of the Fair Labor Standards Act, also applicable.

The third question whether plaintiffs are exempt from the overtime provisions of the Fair Labor Standards Act because they were bona fide administrative or executive employees embodies the storm center of this case. It was to this point, that is, did plaintiffs devote 20% or more of their working time to the same character of work performed by the hourly paid employees, that the voluminous evidence was largely directed.

The testimony upon this point is conflicting and in some respects unsatisfactory. None of the plaintiffs had kept records of the overtime to which they claim they are entitled. The testimony was therefore based upon memory of the occurrences in the years 1943, 1944, and 1945, and was confined to estimates in the most part based upon percentages. It would extend this memorandum to undue length to undertake to summarize the testimony of all the witnesses. The plaintiff, Gray, was the first witness to testify and his testimony is fairly representative of that of the remaining plaintiffs who testified.

His testimony begins at page 69 and was concluded on page 264. He was hired in July, 1943, and quit work in April, 1945. He was assistant foreman, foreman, and general foreman. As assistant foreman, he had from ten to fifteen men under his supervision and admitted that he was employed to do work of a foreman and specifically instructed not to do manual work except insofar as necessary in the instruction of "girls, housewives, school

boys and school girls" who came in there and who "didn't know what a drill or a screw driver was * * * and to run a good, clean, safe shop".

He testified that he assisted in moving the line, opened and shut the doors at the end of the hangar, made parts, cleaned out planes, plugged in batteries and checked wires, installed parts in airplanes, dragged out the heaters so as to heat the planes outside the hangar, checked the part bins, and did a great deal of the work that the hourly paid employees under his supervision and elsewhere in the plant were employed to do. He testified that he worked at least seventy-five hours a week.

Several of the hourly paid employees testified that only in rare instances did they see the plaintiffs doing the work of the hourly paid employees. Mrs. Beatrice Wiggins testified that the plaintiff, Gray, during a part of the time she worked there, was assistant foreman and foreman, and that during a portion of this time she was employed in the station over which he had supervision and that she never saw Gray or the other plaintiffs do any of the manual work about which they testified. She testified that she rode for a time with the plaintiff, Wentworth, and that he would pick her up near her home at about twenty minutes to seven in the morning and that her work day ended at 3:30; that she would wait for him sometimes fifteen or twenty minutes until Wentworth waited for the night foreman to come in to talk to him about the work and then they would leave the plant and return to their homes.

It would be most difficult from the testimony in this case to separate the time of the plaintiffs in instructing and demonstrating how the work should be done to the "girls, housewives, school boys and school girls who didn't know what a drill or a screw driver was" from that portion of time which they may have worked alongside the non-exempt employees in an effort to make up the work to meet the schedule or procure parts from a large plant such as that involved and a large enterprise hastily set up.

The chief executive personnel of the defendant at the plant testified that a frequent check was made throughout the plant in order to ascertain among other things whether the foremen and assistant foremen were performing the work of non-exempt employees. The Army Contract Audit Division, having a personnel of some fifteen, made repeated examinations and checks to see that the employees were properly classified, and in the early part of 1945 the Wage & Hour Division made a rather extensive check over a period of considerable time and advised the defendant that after obtaining complete facts that Department had concluded that all of the employees were properly classified and that the only violation of the Wage and Hour regulations was a failure to have a wage order posted. Plaintiffs criticise the character of check made by the Wage and Hour Division because certain of the plaintiffs testified that the inspectors did not personally interview them. It may be and perhaps is true that the Wage and Hour Division thought the best method of checking the operation was to observe rather than interview. At any rate the opinion of the Regional Director contained in the letter of August 30, 1945, is convincing not only of the opinion stated but of the completeness and thoroughness of the investigation which authorized the letter.

When the plaintiffs were promoted from hourly-paid employees to assistant foremen, they were required to take their tools home, they were not permitted to become or remain members of the union. No complaint was ever made by the foremen nor by the non-exempt employees that the plaintiffs were encroaching upon the field of work set up for the non-exempt employees. As said by the Court in the case of Anderson v. Federal Cartridge Corporation, D.C.Minn., 62 F.Supp. 775, 781, affirmed 8 Cir., 156 F.2d 781; "that he (foreman) worked hard and for long hours is in no way inconsistent with his supervisory responsibilities."

The following excerpt from the opinion in Wells, et al. v. Radio Corporation of America, D.C.S.D.N.Y., 77 F.Supp. 964, 972, relative to foremen and assistant foremen and to their classification as executive employees, seems appropriate in this case:

"While it is easy to understand how an employee in retrospect and after the lapse of years can come to think of himself as having performed a large amount of manual labor, testimony of this character is necessarily unreliable. None of these plaintiffs had any records or memoranda with which to refresh their recollection. Their regular non-manual duties, including a certain amount of demonstrating, were such as necessarily to take up all or almost all of their time. There were stock men available at much less expense to the Company to move hand trucks, carry tote pans and tools and fetch parts which were needed on the production line. The rules of the union forbade the performance of any manual labor by the Foremen and Assistant Foremen, who worked under the constant surveillance of union shop stewards, alert to complain about just such irregularities."

There can be no denial that the plaintiffs in this case worked hard and long hours. On the other hand, it is equally clear that they were well paid as executive employees, were classified as such, and accepted the compensation and classification without complaint until after the employment was made no longer necessary by the successful culmination of the fighting phase of the war.

■ It is my conclusion that the plaintiffs were executive employees within the meaning of the regulations prescribed by the Director under the Fair Labor Standards Act and were exempt as such from the overtime provisions of the Act.

■ Next arises the applicability of sections 9 and 11 of the Portal-to-Portal Act, 29 U.S.C.A. §§ 251–262. First, did the defendant in good faith rely upon rulings, approvals, practices, and interpretations, under the Fair Labor Standards Act concerning the status of the plaintiff employees to the effect that the plaintiffs were executive employees and in good faith believed them to be exempt.

In Section 251 Congress declares that Courts in interpreting the Fair Labor Standards Act have disregarded long established customs, practices and contracts between employers and employees as a result of which employees would receive windfall payments including liquidated damages of sums for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay and that the public treasury would be deprived of large sums of revenue and public finances would be seriously deranged and the cost to the Government of goods and services rendered prior to and subsequent to the enactment of this law would unreasonably increase the cost of the war and seriously impair the revenues of the federal, state and local governments, all constituting a substantial burden on commerce and its free flow.

■ Plaintiffs claim the Act is unconstitutional. The Act, particularly Sections 9 and 11 thereof, are constitutional. Rogers Cartage v. Reynolds, 6 Cir., 166 F.2d 317; Frederick M. Fisch, et al. v. General Motors Corporation and John D. Bateman et al. v. Ford Motor Company, 6 Cir., 169 F.2d 266.

■ Lastly, it is concluded that if Consolidated Vultee were liable to the plaintiffs in this case, the amount would be ascertained by multiplying the number of hours over forty worked by each foreman and assistant foreman in each particular week by one-half of that foreman's or assistant foreman's regular rate of pay for that week, and that the regular rate of pay for that week would be determined by dividing the compensation paid to him for that week by the number of hours worked by him therein, Overnight Motor Transportation Company v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682. Bumpus v. Continental Baking Co., 6 Cir., 124 F. 2d 549, 140 A.L.R. 1258; Lewellen v. Hardy-Burlingham Mining Company, D.C. E.D.Ky., 73 F.Supp. 63.

It is held, therefore, that the plaintiffs are not entitled to recover for the reasons herein set out. Findings of fact and conclusions of law in accordance with the views herein expressed will be submitted by counsel for defendant and a judgment tendered dismissing the complaint.